UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

TIMO J. PELTONEN,                                    CIVIL NO. 05-605 (DWF/JSM)

      Plaintiff,

v.                                                   REPORT AND RECOMMENDATION

BRANCH NO. 9,
NATIONAL ASSOCIATION OF
LETTER CARRIERS (AFL-CIO),

      Defendant.


      JANIE S. MAYERON, U.S. Magistrate Judge

      The above matter came on before the undersigned upon the Union Branch No. 9, National Association of Letter Carriers' Motion to Dismiss Plaintiff's Complaint Pursuant to Fed. R. Civ. P 12(b)(6) [Docket No. 8].  Plaintiff Timo J. Peltonen appeared pro se; and Kelly A. Jeanneta, Esq. appeared on behalf of the Union.  The matter was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## **FACTUAL BACKGROUND**[1]

      Plaintiff, Timo J. Peltonen, an employee of the United States Postal Service ("USPS"), became a member of the Branch No. 9, National Association of Letter Carriers Union ("Union") in October of 2002.  See Complaint, ¶¶ 11-12.  According to the National Agreement between the USPS and the Union, the Union is the exclusive bargaining representative of all mail carrier employees and represents the carriers in

---

[1]     This matter is before the Court on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  Therefore, the Court recites the facts pertinent to the motion from plaintiff's Complaint.

collective bargaining, dealing with employers concerning grievances, terms or conditions of employment, and mutual aid or protection of employees.  Id., ¶ 6.[2]   The National Agreement states that USPS and the Union agree that there will be no discrimination by the USPS or the Union against employees based on national origin, and against handicapped employees, among other protected classifications.  Id., ¶ 10.

When plaintiff began his employment with USPS, he was told that if he had any problems or questions regarding his employment, he should contact Union shop stewards Rimer, Johnston, or Toner.  Id., ¶¶ 13, 14.  On October 18, 2002, plaintiff's first day of work at the West Edina Carrier's Annex ("WECA"), steward Rimer took plaintiff out to lunch with employee Pete Schilling ("Schilling"), another mail carrier, who appeared to have a problem with plaintiff being from Finland.  Id., ¶ 15.

During plaintiff's training, a trainer-carrier, Tim Kivela ("Kivela"), challenged plaintiff to a duel with his scanner and taunted plaintiff by stating, "come on Finlander, you can do it."  Id., ¶ 18.  On October 29, 2002, in the presence of a Union steward, plaintiff was told by his supervisor, Curran, that he had previously fired a foreigner.  Id., ¶ 19.  On November 5, 2002, the acting manager, Daniel Carleen ("Carleen") gave plaintiff his 30-day review.  Id., ¶ 20.  Steward Toner and supervisor Curran were also present during the review.  Id.  Curran told plaintiff that he had failed in employee relations and informed him that "[m]any carriers had complained about  him . . . bad-

---

[2]   According to the Union, the 2001-2006 National Agreement between the National Association of Letter Carriers & the United States Postal Service ("National Agreement") governs the conditions of employment, rights and obligations, and provides a grievance processes.  See Memorandum of Law in Support of Motion to Dismiss Complaint ("Def.'s Mem.") at p. 7.  Plaintiff did not attach a copy of the National Agreement to his Complaint; however, the Union did attach to its memorandum a copy of the section on Grievance-Arbitration Procedure, Article 15, to the National Agreement.

mouthing America.   You should know that foreigners are hated here . . . [e]specially after 9/11, and particularly by veterans." Id.  Curran, also a veteran, told plaintiff that while plaintiff had a First Amendment guarantee to free speech, if Curran ever heard of any complaint by any carrier about plaintiff, Curran would have to let plaintiff go.  Id. Steward Toner did not challenge Curran's statement.  Instead, Toner stated that he was a veteran and that veterans hated foreigners.  Id.  Shortly after this meeting, plaintiff told steward Rimer what had occurred during the review, however, Rimer took no action. Id., ¶ 22.  On November 6, 2002, plaintiff met with steward Johnston and discussed what had transpired during the November 5, 2002 meeting.  Id., ¶ 23.  Johnston took no action on behalf of plaintiff, filed no grievance or raised no issue with union management.  Johnston only told plaintiff that he should let Johnston know before he resigned.  Id.

From October 2002 to December 2003, plaintiff alleges that the Union stewards, USPS management, and other employees harassed him with verbal slurs associated with his ethnicity, perceived religion, and disability; that he was subjected to racial slurs against other non-American employees by both stewards and co-workers; and that supervisor Curran used the threat of termination to force plaintiff to skip breaks with the consent of the Union.  Id., ¶¶ 25, 26, 28.

On December 5, 2002, plaintiff had his 60-day review.  Id., ¶ 30.  Steward Toner and supervisor Curran were present during the review.  Id.  Curran told plaintiff that he had passed every category, that he had received no further complaints about plaintiff, and that he wanted it to continue in that manner.  Id.  According to plaintiff, Toner did not challenge Curran's bigotry during the review.  Id.

On January 2, 2003, plaintiff had his 90-day review with Curran, in the presence of steward Toner.  Id., ¶ 32.  Curran told plaintiff that because he had not received any further complaints about plaintiff, he was recommending that plaintiff be converted to regular status.  Id.  Plaintiff alleged that steward Toner, again did not challenge bigotry displayed by Curran.  Id.

From February 17, 2003 to April 21, 2003, plaintiff was absent from work due to illness and major dental surgery.  Id., ¶¶ 34, 35.  A week prior to returning to work, Lynch[3] told plaintiff that his doctor notes needed to include an exact diagnosis and ordered plaintiff to provide him with one.  Id., ¶ 35.  In addition, Lynch suggested that plaintiff go back to Finland.  Id.  Plaintiff reported this remark to steward Johnston.  Id., ¶ 38.

When plaintiff did return to work on April 21, 2003, he had a work restriction from his doctor, limiting him to working 40 hours per week.  Id., ¶¶ 35, 36.  Steward Johnston called plaintiff a "big fucking jerk," because he had not known the procedures for doctor's notes for management.  Id., ¶ 36.  When plaintiff asked steward Johnston to verify whether management had a right to know his diagnosis, Johnston said that they did, which according to plaintiff, was contrary to the USPS Employee and Labor Manual. Id., ¶ 37.  Steward Johnston also provided incorrect information to plaintiff regarding the number of breaks to which he was entitled, as well incorrect information on bidding for mail routes.  Id., ¶¶ 39-41.

Throughout the summer of 2003, plaintiff alleged that manager Carleen and supervisor Benda attempted to find complaints about plaintiff's work, and that the Union

---

[3]    In paragraph 52 of the Complaint, plaintiff alleged that Lynch was a manager.

was aware of the intimidation, harassment, and the violations of the National Agreement, however, it took no action to protect plaintiff.  Id., ¶ 44.  In response to complaints made by plaintiff to steward Johnston regarding breaks, Carleen told plaintiff that he was entitled to two ten-minute breaks and one thirty-minute lunch break every day, and reprimanded plaintiff for being defiant when plaintiff said that he promised to take his breaks everyday.  Id., ¶ 47.  Plaintiff learned from another employee, and not the Union, that he was permitted to take rest-room breaks on company time, in addition to his other breaks.  Id., ¶ 48.

Plaintiff also claimed that during the summer of 2003, a senior carrier used explicitly sexual comments, engaged in mock sex acts, and viewed sexually explicit publications.  Id., ¶ 50.  Although plaintiff asked the stewards to stop this activity, the stewards never did.  Id.  According to plaintiff, management and the Union knew about the hostile environment, involving sex, but did nothing to stop this activity.  Id., ¶ 51.

In July of 2003, plaintiff complained to steward Johnston about being assigned to work one day at the Bloomington, Minnesota station.  Id., ¶¶ 53, 54.  Johnston refused to do anything about plaintiff's assignment despite Johnston's opinion that it was revenge for plaintiff's attempts to defend his rights to breaks and procedures over the previous two months.  Id., ¶ 54.  In addition, steward Johnston failed to intervene on plaintiff's behalf to get USPS to reimburse plaintiff for the mileage he had incurred by traveling to the Bloomington station.  Id., ¶ 55.  Plaintiff was assigned to the Bloomington station one more day and the Union again chose not to take action against the assignment.  Id., ¶ 56.  Further, no Union stewards took any action in July of 2003, when plaintiff showed them evidence that someone was trying to sabotage his route.  Id., ¶ 57.

On August 11, 2003, plaintiff alleged that he began working a new route that was comprised of apartment buildings with a thousand new names and many address changes.  Id., ¶ 59.  Consequently, due to the amount of mail, plaintiff curtailed the bulk mail, "cased" only the First and Second Class mail, and worked all day without breaks. Id.  In the afternoon, plaintiff called in his position to the station and the USPS sent another carrier to help him.   Id.   After this occurred, Carleen ordered plaintiff and steward Johnston into his office where he proceeded to belittle plaintiff's command of the English language by stating that maybe he did not understand what he had been told in the past regarding not having to carry mail by himself and that others would help him.  Id., ¶ 60.  Further, Carleen claimed that plaintiff had "cased" too much mail, which led to his inability to finish the route in eight hours.  Id.  According to plaintiff, steward Johnston did nothing to curb Carleen's scolding or remedy the situation.  Id.  After the meeting with Carleen, plaintiff asked steward Johnston why the Union did nothing to restrain the harassment and discrimination of management, to which Johnston replied that no employee would put their complaints in writing.  Id., ¶ 61.

At the end of August, 2003, plaintiff filled out a survey and wrote a personal letter to the Postmaster of Minneapolis, in which he complained about the constant harassment by management.  Id., ¶ 62.  Plaintiff alleged that management and the Union then retaliated against him for his input to the Postmaster by increasing their intimidation and harassment of him, which affected his body and mind.  Id., ¶¶ 63, 64.

On September 10, 2003, plaintiff's physician placed him on a restricted 40-hour per week schedule due to excessive stress and anxiety accompanied by physical problems.  Id., ¶ 67.  Plaintiff showed the doctor's note to steward Johnston who replied that management would "not like this at all," that plaintiff had obtained the doctor's note

to avoid work and because he was tired of dealing with Carleen.  Id., ¶ 68.  Johnston's attitude towards plaintiff then changed and he became openly critical of plaintiff's problems with management.  Id., ¶ 69.

On September 16, 2003, plaintiff gave the doctor's note to manager Lynch, who immediately ordered plaintiff and steward Johnston to his the office.  Id., ¶ 70.  Lynch asked if the stress was due to work, and plaintiff said it was.  Id.  Lynch then gave to plaintiff forms to make a claim for worker's compensation and FMLA.  Id.  Plaintiff told Lynch that he did not want to take leave or workers compensation, but instead wanted to be free of harassment while he worked.  Id.  After the meeting, Johnston became angry with plaintiff and suggested that plaintiff was trying to avoid work, to which plaintiff replied that he was really sick.  Id., ¶ 71.  According to plaintiff, the intimidation, harassment, and threat of termination increased after the September 16 meeting with Lynch, all with the knowledge of the Union of plaintiff's psychological and physical problems.  Id., ¶ 72.

In September 2003, plaintiff asked steward Johnston many times why the Union was not doing anything about management's daily harassment of its carriers.  Id., ¶ 74.  Johnston told plaintiff that no one had the guts to put anything in writing so he had nothing to work with.  Id.  When plaintiff suggested to Johnston that he call a meeting to discuss the problems at the station, Johnston said no one would come.  Id.  Plaintiff also told steward Toner that four carriers were on medication for depression and that they were thinking of filing a lawsuit against the USPS.  Id., ¶ 75.  Toner told plaintiff, "you can't sue the government."  Id.

On September 30, 2003, manager Carleen picked a fight with plaintiff over his request to work only seven hours that day because of a doctor's appointment.  Id., ¶¶

76, 77.  According to plaintiff, Carleen had approved the request, but then tried to get plaintiff to work two hours for free to make up for the lost hour.  Id. ¶ 77.  When plaintiff told Carleen he had been unable to case all the mail before he started the route, Carleen ordered plaintiff back to case the mail.  Id., ¶ 78.  When plaintiff told Carleen he had a severe headache, Carleen screamed, "are you threatening me? I can fire you on the spot."  Id.  Johnston was called into the office with plaintiff, at which time Carleen re-stated his threat to fire plaintiff due to his performance.  Id., ¶ 79.  Johnston defended plaintiff during this incident by telling Carleen that yelling is a threat, to which Carleen told Johnston that he could file a grievance.  Id.  Plaintiff alleged that Carleen had picked this fight in retaliation for the letter plaintiff had sent to the Postmaster of Minneapolis.  Id., ¶ 77.

On September 30, 2003, plaintiff wrote a complaint letter to the Union about the incident with Carleen.  Id., ¶ 81.

Plaintiff then alleged that while he was on medical leave[4], the Union stewards and USPS management made a deal to give him a two-month reprieve from harassment and then take steps to get rid of him.  Id., ¶ 82.  In this regard, plaintiff stated that the USPS and the Union did not subject him to harassment for the following two months.  Id., ¶ 83.  During this period, plaintiff began seeing a psychologist and psychiatrist, and plaintiff alleged that his job performance began to decrease because his work was being sabotaged.  Id., ¶¶ 84, 85, 90.

In October of 2003, plaintiff noticed a red laser dot, the type used in firearms, on his head.  Id., ¶ 92.  Plaintiff found out from another employee that it was Schilling who

---

[4]     Plaintiff did not state when this medical leave occurred.

had pointed the laser dot at his head.   Id.   Plaintiff told steward Johnston about the incident, but Johnston took no action on behalf of plaintiff.   Id.

In November of 2003, steward Johnston told plaintiff that he was okay in his book despite the fact that others called him a "big fucking jerk from Finland."   Id., ¶ 94.   On December 2, 2003, steward Rimer picked a fight with plaintiff, called plaintiff a "Fucking Finlander" and said something about punching plaintiff.   Id., ¶ 95.   Both stewards Rimer and Johnston laughed at plaintiff during this incident.   Id.   When steward Rimer found out that plaintiff had reported the slur of "fucking Finlander", he replied that plaintiff would never work at the post office again and also stated that the slur was no big deal. Id., ¶ 123.

On December 20, 2003, plaintiff went to see supervisor Benda to get a signature for a new doctor's note.   Id., ¶ 98.   Benda became irritated with plaintiff and in front of other employees, yelled that notes were not enough for him and that he wanted a note that provided details on plaintiff's illness, its duration, medication, and treatment.   Id., ¶ 99.   When plaintiff objected to his demands, Benda stated that he wanted to know if plaintiff was fit to work.   Id.   Benda came back with a form and handed it to plaintiff, who refused to take it, which caused Benda to yell at plaintiff, and claim that plaintiff was disobeying a direct order.   Id., ¶ 100.   This occurred in front of Mike Smith who was a steward-elect.   Id.   Plaintiff told Benda that he was so upset that he did not think he could finish his route that day, to which Benda replied that if he left work he would be AWOL.   Id., ¶ 102.   Plaintiff also told Benda he was going to see a doctor because of his harassment.   Id., ¶ 104.   After Benda left the office, plaintiff told steward Johnston what had happened and how sick he was.   Id., ¶ 103.   Johnston stated that plaintiff was not the only one management was after.   Id.   Plaintiff then met stewards Johnston and

Toner and told them that he could not take the harassment anymore and that management's ridicule and refusal to accept his physician's orders was too much for him.  Id., ¶ 105.

Plaintiff wrote a complaint about the December 20, 2003 incident to the Union. Id., ¶ 106.  He also met with his psychiatrist who prescribed a two-week leave.  Id., ¶ 107.  Plaintiff went to the station to give the doctor's note to manager Provo, when stewards Rimer and Johnston approached plaintiff and suggested that he have a meeting with Provo to resolve all issues.  Id., ¶¶ 108-110.  According to plaintiff, steward Johnston conspired with Provo and Rimer to have a meeting with plaintiff in order to force him into a light duty position, which is prohibited by the National Agreement, interfered with his rights under the FMLA, and amounted to an adverse employment action.  Id., ¶¶ 111-121.  According to plaintiff, the continuous harassment and discrimination was so severe that in response to the final "betrayal" by the Union and USPS, a psychiatrist ordered to make him take medical leave on December 23, 2003. Id., ¶ 122.  Plaintiff asserted that this forced, unpaid medical leave is an adverse employment action and constitutes constructive discharge.  Id.

On January 19, 2004, plaintiff called the President of the Union about the complaint he was making against the USPS.  Id., ¶ 125.  He called the Union office multiple times, but received no response.  Id., ¶¶ 126, 131, 132.  On February 25, 2004, the President of the Union called plaintiff and told plaintiff that he was not a member of the Union, and then inquired about alleged death threats made by plaintiff to another carrier.  Id., ¶¶ 127-128.  The President promised to call plaintiff back about the discrimination and harassment alleged by plaintiff, however, he never called plaintiff back.  Id., ¶ 129.

Plaintiff investigated the alleged death threat he had made and learned that Schilling had been telling everyone that his life had been threatened and that plaintiff was "insane", "crazy" and would come to the station and shoot him and other carriers. Id., ¶ 130.  Plaintiff called the President of the Union twice in March 2004, but he never called back.  Id., ¶¶ 131, 132.

Plaintiff also found out that the Union and USPS management had met on June 21, 2004 regarding plaintiff's legal actions.  After the meeting steward Toner was asked if he had gotten his story straight, to which Toner responded that plaintiff would not have a chance.  Id., ¶ 133.

On July 12, 2004, plaintiff filed a Title VII complaint with the Equal Employment Opportunity Commission ("EEOC") against the Union.  Id., ¶ 134.  In his affidavit in the EEO investigation, Benda stated that he accepted plaintiff's medical documentation on December 20, 2003.  Id., ¶ 101.

Plaintiff also asserts that Union stewards lied to the investigator from the National Labor Board ("NLRB").  Id., ¶ 135.  In particular, plaintiff claims that steward Johnston lied that the December 20, 2003 incident with USPS management was not about the supervisor's refusal to accept plaintiff's doctor's notes, but about plaintiff's refusal to carry an assigned route due to his medical condition.  Id. In addition, plaintiff alleged that Johnston lied to the NLRB investigator by stating that he had attempted to get plaintiff to sign a grievance and that plaintiff had refused.  Id., ¶ 136.  Plaintiff claims he submitted two written complaints to the Union in September and December 20, 2003, and that Johnston never agreed or attempted to file a grievance on behalf of plaintiff. Id.

On December 13, 2004 the USPS sent Postal Inspector agents to plaintiff's home to investigate if he was planning to kill Schilling.  Id., ¶ 138.  On December 22, 2004, plaintiff sent a Summons and Complaint to Schilling regarding defamation and intentional infliction of emotional distress.  Id., ¶ 141.  Schilling bragged about negotiating with the Union to defend him against plaintiff's claims.  Id.

Plaintiff has brought the following claims against the Union: (1) Retaliation against the Exercise of First Amendment Rights under 42 U.S.C. § 1983; (2) Title VII Violation under 42 U.S.C. § 2000e-2000e-17; (3) Violation of the National Labor Relations Action ("NLRA") under 29 U.S.C. §§ 158, et seq.; (4) Violations of the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.08; (5) Civil Rights Violation under 18 U.S.C. § 241; (6) Civil Rights Violation under 18 U.S.C. § 245; (7) Civil Rights Violation under 42 U.S.C. § 1986; (8) Americans with Disabilities Act ("ADA") Violation under 42 U.S.C. § 12101, et seq.; (9) Violations of the MHRA, Minn. Stat. § 363A.02; (10) Criminal Aiding and Abetting Under Minn. Stat. § 363A.14; (11) Intentional Reprisal under the MHRA, Minn. Stat. § 363A.15; (12) Defamation per se; (13) Intentional Infliction of Emotional Distress; (14) Negligent Infliction of Emotional Distress; and (15) Intentional Interference with Contractual Relations.

Defendant has brought a motion to dismiss related to the claims asserted against it by plaintiff.  In particular, the Union asserts that plaintiff's claims are barred because he has failed to exhaust the grievance process set out in the National Agreement.  See Def.'s Mem. at pp. 9-10.  Defendant also claims that plaintiff's duty of fair representation claim fails to state a claim for relief, and in any event, is time-barred.  Id. at pp. 11-14. Further, the Union argues that plaintiff's state law claims should be dismissed as preempted under section 301 of the Labor management Relations Act ("LMRA"), 29

U.S.C. § 185.  Id. at pp. 20-22.  Finally, the Union maintains that plaintiff's state and federal discrimination and retaliation claims, conspiracy claims, and state law claims all fail to state claim for which relief can be granted.

In his opposition brief and at the hearing, plaintiff stated that he was dismissing his Third, Fifth, Sixth and Ninth Claims for Relief.[5]  Therefore, this Court will only address the remaining twelve claims.

## DISCUSSION

## I.   STANDARD OF REVIEW

Defendant has moved this Court for an order dismissing plaintiff's complaint under Rule 12(b)(6) of Federal Rules of Civil Procedure.  When evaluating a motion to dismiss for failure to state a claim under Rule 12(b)(6), courts must view the complaint in the light most favorable to the non-moving party and may dismiss the complaint only if no relief can be granted under any set of facts that could be proven consistently with the complaint's allegations.  Alexander v. Peffer, 993 F.2d 1348, 1349 (8th Cir. 1993) (quoting Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)); see also Haines v. Kerner, 404 U.S. 519, 520 (1972) (per curiam) (pro se complaints are held to less stringent standards than formal pleadings drafted by lawyers).  To avoid dismissal under Rule 12(b)(6), the "complaint must contain sufficient facts, as opposed to mere conclusions, to satisfy the legal requirements of the claims."  DuBois v. Ford Motor Credit Co., 276 F.3d 1019, 1022 (8th Cir. 2002).[6]

---

[5]     Violation of the National Labor Relations Action ("NLRA") Under 29 U.S.C. §§ 158, et seq.; Civil Rights Violation Under 18 U.S.C. § 241; Civil Rights Violation Under 18 U.S.C. § 245; Violations of the MHRA, Minn. Stat. § 363A.02.

[6]     As a general rule, the Court may not consider materials "outside the pleadings" on a motion to dismiss.  However, this does not mean that only the Complaint itself may

With this standard of review in mind, the Court now examines the allegations of plaintiff's Complaint against the Union.

## II.    EXHAUSTION

The Union argued that plaintiff's claims are barred because he failed to exhaust the grievance and arbitration remedies available under the National Agreement.  <u>See</u> Def.'s Mem. at p. 9.   This Court disagrees.   "Failure to exhaust the grievance procedures of the collective bargaining agreement is a defense to a suit on the collective bargaining agreement."  <u>Moore v. General Motors Corp.</u>, 739 F.2d 311, 317 (8th Cir. 1984) (citing <u>Hines v. Anchor Motor Freight Inc.</u>, 424 U.S. 554, 562 (1976);

---

be reviewed.  As the Court noted in <u>Porous Media Corp. v. Pall Corp.</u>, 186 F.3d 1077, 1079 (8th Cir.1999):

> When considering a motion for judgment on the pleadings (or a motion to dismiss under Fed. R. Civ. P. 12(b)(6)), the court generally must ignore materials outside the pleadings, but it may consider 'some materials that are part of the public record or do not contradict the complaint,' <u>Missouri ex rel. Nixon v. Coeur D'Alene Tribe</u>, 164 F.3d 1102, 1107 (8th Cir.), <u>cert. denied</u>, __U.S.__, No. 98-1848, 1999 WL 319349 (U.S. June 24, 1999), as well as materials that are 'necessarily embraced by the pleadings.' <u>Piper Jaffray Cos. v. National Union Fire Ins. Co.</u>, 967 F. Supp. 1146, 1152 (D. Minn. 1997).  <u>See also</u> 5A Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure: Civil 2d</u> §1357, at 199 (1990)(court may consider 'matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint').

Although the National Agreement, cited to in the Complaint and relied upon by both parties in their respective submissions, is technically "outside the pleadings," it does not contradict the Complaint and in fact, is embraced by the pleadings.  Therefore, the Court will consider National Agreement without converting the Union's motion to dismiss into a motion for summary judgment.  <u>See</u> <u>Carlson v. Arrowhead Concrete Works, Inc.</u>, 375 F. Supp.2d 835, 838 n. 2 (D. Minn. 2005) (finding that a collective bargaining agreement at issue was embraced by the complaint in that case) (citing <u>In re K-tel Int'l Sec. Litig.</u>, 300 F.3d 881, 889 (8th Cir. 2002)).

Vaca v. Sipes, 386 U.S. 171, 184 (1967)).  However, in this case, there is nothing in the National Agreement that bears on or requires an employee to exhaust claims against the Union, as opposed to the employer.  See Hester v. International Union of Operating Engineers, AFL-CIO, 941 F.2d 1574, 1580 (11th Cir. 1991) (finding that exhaustion of the collective bargaining agreement grievance procedure in order to maintain his claim of breach of the collective bargaining agreement against the union was not required as the collective bargaining agreement only provided for grievances against the employer).

Further, even if plaintiff were required to grieve his complaints against the Union, plaintiff has alleged facts in the Complaint to establish that he has satisfied the requirements of the grievance process. The Complaint is replete with allegations that plaintiff verbally complained to the Union stewards on numerous occasions and that he sent letters to the Union on September 20 and December 30, 2003, complaining of USPS' activities against him.  See, e.g., Complaint, ¶¶ 54, 57, 74, 103, 105, 125, 126, 131, 132.  Once these complaints had been made, plaintiff had done what he was required to do under the grievance procedure outlined in the National Agreement, and the ball was in the Union's court to take up the grievance.  See National Agreement, Grievance-Arbitration Procedure, Article 15 attached to defendant's memorandum.[7]  As such, this Court finds that to the extent there was any requirement that plaintiff exhaust

---

[7]      The grievance procedure under Article 15 of the National Agreement requires an employee (or the Union) to first discuss the grievance with the employee's immediate supervisor within fourteen days from which the employee first learned or "may reasonably have been expected to have learned of its cause."  See National Agreement, Article 15, Section 2.  If no resolution is reached as a result of this informal process, "the Union shall be entitled to file a written appeal to Formal Step A of the grievance procedure within seven (7) days after the date of the discussion."  Id. (emphasis added).  Thus, after the informal grievance discussion has taken place at the initiation of the employee or the Union, it is up to the Union to formally grieve the dispute.

his claims against the Union, the Union's argument of exhaustion does not dispose of plaintiff's claims on the present 12(b)(6) motion to dismiss.

## III.     BREACH OF DUTY OF FAIR REPRESENTATION

Defendant argued that plaintiff's claim for breach of duty of fair representation should be dismissed, on grounds that it fails to state a claim for relief, and is time-barred.  See Def.'s Mem. at pp. 11-14.  Having carefully examined the four corners of plaintiff's Complaint, and in particular the sixteen claims for relief, this Court rejects the Union's argument for the simple reason that plaintiff has not asserted a breach of the duty of fair representation claim in the Complaint.  As plaintiff has not made such a claim, this Court has no basis for considering its dismissal on any grounds.[8]

---

[8]     The Court observes that had plaintiff alleged a breach of duty of fair representation claim, it would have been barred under the facts alleged by plaintiff in the Complaint.  A breach of duty of fair representation claim is governed by a six-month statute of limitations.  See DelCostello v. Teamsters, 462 U.S. 151, 169-72 (1983); Tripp v. Angelica Corp., 921 F.2d 794, 795 (8th Cir. 1990); DeSantiago v. Laborers Int'l Union Local, No. 1140, 914 F.2d 125, 130 (8th Cir. 1990).  "Courts have generally held that the six-month limitations period begins to run when the employee knows or reasonably should know that the Union has breached its duty of fair representation."  Skyberg v. United Food and Commercial Workers Intern. Union, AFL-CIO, 5 F.3d 297, 301 (8th Cir. 1993).  Plaintiff alleges throughout his Complaint that the Union failed to take action on his behalf throughout 2002 and 2003.  His last contact with the Union was in March 2004, when he called the President and got no response.  See Complaint, ¶¶ 131, 132.  Under these facts, as plaintiff's case was not filed with this Court until March 22, 2005, the action was begun well after the deadline for commencing an action.  Plaintiff's response to the statute of limitations argument—that his latest request for Union assistance was in April 2005, when he asked current steward Mike Smith to meet with him and Smith declined to meet with the plaintiff (See Pl.'s Mem." at p. 9)—is of no avail.  This allegation was not included in the Complaint, nor could it have been since this event occurred after plaintiff filed his Complaint on March 22, 2005.  Thus, this event could not have saved a claim by plaintiff for breach of the fair duty of representation.

IV.   **STATE LAW CLAIMS**

The Union argues that plaintiff's state claims of defamation, intentional infliction of emotional distress, negligent infliction of emotional distress, and intentional interference with contractual relations should be dismissed on grounds that they are preempted by section 301 of the Labor Management Relations Act (LMRA) and the Garmon doctrine, and because they fail to state a claim for relief under state law.

A.     **Preemption of State Claims Under Section 301 of the LMRA**

The Union maintains that plaintiff's state law claims are preempted under section 301 of the LMRA because they "squarely depend on interpretation of the parties' collective bargaining agreement." Id. at p. 21.

The doctrine of "complete preemption" arises out of the Supremacy Clause of the Constitution, U.S. Const. art. VI, cl. 2, which requires that state law give way when it conflicts with or frustrates federal law. See Chapman v. Lab One, 390 F.3d 620, 624 (8th Cir. 2004) (citation omitted). "The complete preemption doctrine converts an ordinary state-law claim into a federal claim where 'the pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim. . . .'" Gore v. Trans World Airlines, 210 F.3d 944, 949 (8th Cir. 2000) (quoting Caterpillar Inc. v. Williams, 482 U.S. 386, 393 (1987), quoting Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 65 (1987)). The doctrine of "complete preemption" has been applied to cases arising under § 301 of the LMRA. See Chapman, 390 F.3d at 629 (citing Avco Corp. v. Machinist, 390 U.S. 557 (1968)).

Section 301 provides in relevant part:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between

> any such labor organizations, may be brought in any district
> court of the United States having jurisdiction of the parties,
> without respect to the amount in controversy or without
> regard to the citizenship of the parties.

29 U.S.C. § 185(a).

It is settled law that a Union can be sued for breaching its responsibility due to its members, and that such a cause of action arises under section 301 of the LMRA, 29 U.S.C. § 185.  See Vaca, 386 U.S. at 187-88; Motorcoach Employees of America v. Lockridge, 403 U.S. 274, 299 (1971).  However, Section 301 does not preempt a state law claim "unless the state-law claim itself is based on, or dependent on an analysis of, the relevant [Collection Bargaining Agreement]."  Meyer v. Schnucks Markets, Inc., 163 F.3d 1048, 1050 (8th Cir. 1998) (citing Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399, 405-06 (1988)); see also Graham v. Contract Transportation, Inc., 220 F.3d 910, 913 (8th Cir. 2000) (The Eighth Circuit, noting conflicting precedents within the Eighth Circuit, determined that the following narrower approach to § 301 preemption is more faithful to Supreme Court precedent: "that a claim be grounded on the rights established by a CBA, or substantially dependent on an analysis of a CBA, before it may be found to be preempted.") (citation omitted).  Further, "a state law claim may involve analysis of the same set of facts as a claim arising under the collective bargaining agreement without compelling preemption."  Hanks v. General Motors Corp., 906 F.2d 341, 343 (8th Cir. 1990) (citing Lingle, 486 U.S. at 407-08); see also Meyer, 163 F.3d at 1050 ("the fact that a claim could have been laid as a violation of a CBA does not necessarily mean that the LMRA preempts it.").  "A claim is not preempted simply because it relates to a dispute in the workplace."  Graham, 220 F.3d at 913 (citation omitted).

The Union's preemption argument is a conclusory one, without any analysis based on fact or law. Thus, this Court proceeds with its own examination of plaintiff's state law claims of defamation, intentional infliction of emotional distress, negligent infliction of emotional distress, and intentional interference with contractual relations to determine if any or all of them are preempted by the LMRA.

### 1.   Defamation

As far this Court can discern, plaintiff is claiming defamation against the Union based on his assertion that the Union stewards spread rumors that plaintiff was trying to avoid work, and that plaintiff perjured himself to the investigators from the NLRB, and EEOC. See Complaint, ¶ 181. Plaintiff's defamation claim in this case is neither premised upon an alleged violation of any term of the National Agreement, nor is it dependent upon interpretation of the National Agreement's terms. See Mike v. Ron Saxon Ford, Inc., 960 F. Supp. 1395, 1398 (D. Minn. 1997) (finding no preemption under the LMRA for a state defamation claim). Instead, the defamation claim involves a purely factual inquiry surrounding the alleged publication of defamatory statements regarding plaintiff, i.e., that he tried to avoid work by claiming sick and perjured himself to investigators. See Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 261 (1994) (quoting Lingle, 486 U.S. at 407) ("'[P]urely factual questions' about an employee's conduct or an employer's conduct and motives do not 'requir[e] a court to interpret any term of a collective-bargaining agreement.'"). Consequently, as the alleged dissemination by the Union, through its agents, of false information regarding plaintiff pertains to his right to be free from the dissemination of false statements made by others, it is not preempted by the LMRA, and plaintiff's defamation claim should not be dismissed on that ground. See Luecke v. Schnucks Markets, Inc., 85 F.3d 356, 360

19

(8th Cir.1996), cert. denied, 519 U.S. 1011 (1996) (finding that the plaintiff's claim regarding his employer's dissemination of false information about the plaintiff's refusal to take a drug test, that a collective bargaining agreement mandated, was not preempted since the claim did not attack the employer's right to require drug tests, but challenged the dissemination of false information); see also Graham, 220 F.3d at 913 (finding that the right to be free from false and harmful statements is a right that is independent of any collective bargaining agreement).

### 2.    Intentional Infliction of Emotional Distress

Plaintiff claims that the Union "intentionally inflicted extreme emotional distress upon him by "spreading false statements, perjuring themselves, obstructing justice, and conspiring with the USPS to force him to an unpaid medical leave." See Complaint, ¶ 186.  "'A claim of intentional infliction of emotional distress in the workplace will avoid preemption [under § 301 of the LMRA] if the [defendant's] outrageous conduct violates its duty to every member of society, not just to employees covered by the collective bargaining agreement.'" Oberkramer v. IBEW-NECA Service Center, Inc., 151 F.3d 752, 757 (8th Cir. 1998) (quoting St. John v. International Association of Machinists & Aerospace Workers, Local No. 1010, 139 F.3d 1214, 1219 (8th Cir.1998)).   In determining whether a claim is preempted, "'the factual background of the entire case must be examined against an analysis of the state tort claim to determine whether the provisions of the collective bargaining agreement come into play.'" Id.

In Oberkramer, supra, the plaintiff brought a claim against his employer for intentionally inflicting emotional distress upon him and for violating a St. Louis City Municipal ordinance by discriminating against him based on sexual orientation. See Oberkramer, 151 F.3d at 755.   The Eighth Circuit found that the source of

20

Oberkramer's right to be free from emotional distress caused by discrimination related to his sexual orientation was the collective bargaining agreement's nondiscrimination clause, as the city ordinance created no private cause of action. Id. at 757. As such, the Eighth Circuit concluded that the intentional infliction of emotional distress claim was preempted under the LMRA because it would require a determination of whether the union's actions were prohibited under the collective bargaining agreement, making the claim substantially dependent upon an analysis of the terms or provisions of the collective bargaining agreement. Id.

On the other hand, in Hanks, supra, the plaintiff alleged that her employer intentionally inflicted emotional distress upon her by requiring her to return to a job that was under the direct supervision of the person who sexually assaulted her daughter. See Hanks, 906 F.2d at 343. The union claimed that the plaintiff's state law claim was preempted under section 301 of the LMRA as its actions were justified by the collective bargaining agreement. Id. The Eighth Circuit found that preemption of plaintiff's intentional infliction of emotional distress claim was not warranted on several grounds. First, the court found that the plaintiff's accusation that her employer intentionally injured her by requiring her to work with a person who sexually assaulted her daughter involved duties owed by the employer to every member of society, not just to employees covered by the collective bargaining agreement. Id. at 344 (citing United Steelworkers of America v. Rawson, 110 S.Ct. 1904, 1910-11 (1990) (holding that the state law claim was preempted because it was inextricably intertwined but stating that the result would have been different if the defendant had violated a general duty owed to all citizens); Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 211-12 (1985) (§ 301 does not grant the parties to a collective bargaining agreement the ability to contract for what

is illegal under state law); <u>Alexander v. Gardner-Denver Co.</u>, 415 U.S. 36, 51 (1974) (while certain rights under the NLRA are waivable, an individual's substantive right derived from an independent body of law cannot be avoided by a contractual agreement)).

Second, the court found that neither plaintiff's claims nor the employer's defense that it was acting under the collective bargaining agreement required the trier of fact or law to find that her discharge was warranted under the terms and provisions of the collective bargaining agreement. <u>Id.</u> As a part of this finding, the Eighth Circuit noted that the possibility that the plaintiff had a grievance under the collective bargaining agreement was not sufficient to conclude that preemption was in order given that the collective bargaining agreement did not envision such conduct by the employer nor did the terms or provisions of that agreement shed any light on the appropriateness of the employer's conduct. <u>Id.</u> at 345.

Third, the Eighth Circuit concluded that the possibility that plaintiff might be able to grieve the employer's conduct under procedures provided in the collective bargaining agreement was not sufficient in of itself to conclude that the plaintiff's tort claim was preempted. <u>Id.</u> at 345. Specifically, the Eighth Circuit found:

> [N]one of Hanks' claims purport to give meaning to the terms of the collective bargaining agreement. Her claims are not derivative of any rights or duties provided by that agreement. She asks for damages not for her discharge, but for harm that allegedly resulted from GM requiring her to work under the supervision of the person who sexually assaulted her daughter. Because Hanks' claims in no way depend on an interpretation of a collective bargaining agreement, we conclude that her claims are not preempted by § 301 of the LMRA.

<u>Id.</u>

In <u>Meyer</u>, <u>supra</u>, the Eighth Circuit also considered whether an intentional infliction of emotional distress claim was preempted by § 301 of the LMRA.  The plaintiff in <u>Meyer</u> claimed that by transferring him to another location, his employer retaliated against him for his criticisms of the company by allowing its supervisors to harass him and to criticize him publicly.  <u>See</u> <u>Meyer</u>, 163 F.3d at 1049, 1051.  The district court found that plaintiff's claims for intentional infliction of emotional distress and civil conspiracy were preempted because they required the interpretation of the section of the collective bargaining agreement protecting employees against unjustifiable or discriminatory transfers.  <u>Id.</u> at 1050.  The Eighth Circuit reversed the holding of the district court, finding that the fact that the collective bargaining agreement prohibited the transfer of employees without justification or for discriminatory reasons had no legal significance with regards to preemption since the plaintiff's state-law claim was not dependent upon an interpretation of the collective bargaining agreement.  <u>Id.</u>  The court concluded that "[t]o decide those claims, a trier of fact would have to consider only [defendant's] conduct and motives, and the effect of its behavior on [plaintiff]."  <u>Id.</u>

In this case, plaintiff asserted that the Union intentionally inflicted emotional distress upon his person by spreading false statements, committing perjury, obstructing justice, and conspiring with the USPS to force him to take unpaid medical leave.  <u>See</u> Complaint, ¶ 186.  The false statements allegedly spread by the Union included that plaintiff had been making terroristic threats, plaintiff was trying to avoid work, and that plaintiff had perjured himself to the investigators from the NLRB and EEOC.  <u>See</u> Complaint, ¶¶ 135, 136, 144, 146, 181.  As this Court determined with respect to plaintiff's defamation claim, the issue of whether the Union and its agents lied about plaintiff is an issue of fact that is independent of the National Agreement.  In addition,

the intent behind the Union's alleged dissemination of false statements and the harm suffered by plaintiff has no bearing on the National Agreement. See Hawaiian Airlines, Inc., 512 U.S. at 261 (quoting Lingle, 486 U.S. at 407). In other words, this Court cannot conclude that plaintiff's intentional infliction of emotional distress claim based on false statements made by the Union is founded directly on rights created by the National Agreement or is substantially dependent on the analysis of the National Agreement. See Graham, 220 F.3d at 913.

With regard to plaintiff's claims that the Union engaged in perjury and obstructed obstructing justice, plaintiff alleged that the Union and its agents lied to federal investigators as to the events that occurred on September 30, 2003 and December 20, 2003. In particular, plaintiff claims that steward Johnston lied that the December 20, 2003 incident with USPS management was not about the supervisor's refusal to accept plaintiff's doctor's notes, and about plaintiff's refusal to carry an assigned route due to his medical condition. See Complaint, ¶ 135. In addition, plaintiff alleged that Johnston lied to the NLRB investigator by telling the investigator that he attempted to get plaintiff to sign a grievance and that plaintiff had refused. Id., ¶ 136. Again, these assertions pertain to whether the Union lied to federal investigators and its intent for doing so. These questions do not implicate the National Agreement, and therefore a finding of preemption as to this claim is not warranted based on the allegations of the Complaint.

As to plaintiff's claim that the Union intentionally inflicted emotional distress on him by conspiring with the USPS to force him to take unpaid medical leave, there are not enough facts alleged in the Complaint to allow this Court to determine whether this claim is founded directly on rights created by the National Agreement or if a resolution of the claim is substantially dependent on analysis of the National Agreement. As

such, this Court finds that the Union has not established that it is entitled to dismissal of this claim based on this argument.

For all of these reasons, this Court recommends denial of the Union's motion to dismiss on the grounds of preemption with regards to plaintiff's claim Union intentionally inflicted emotional distress on him.

### 3.     Negligent Infliction of Emotional Distress

Plaintiff maintains that the Union negligently inflicted emotional distress upon his person by breaching the collective bargaining agreement, discriminating and harassing him, spreading false statements, perjuring itself, obstructing justice, and conspiring with the USPS to force him to take unpaid medical leave.  See Complaint, ¶ 192.  As a starting point, this Court finds that plaintiff's negligent infliction claim for emotional distress based spreading false statements, perjury, obstructing justice, and conspiring with the USPS to force him to take unpaid medical leave survive the Union's preemption defense for the reasons stated forth in this Court analysis of preemption relating to plaintiff's claim for intentional infliction of emotional distress.  See supra, Report and Recommendation, section IV.A.2.

However, plaintiff's negligent infliction of emotional distress claim does differ from his claim for intentional infliction of emotional distress in that plaintiff also asserted the following additional factual predicates for this claim: that the Union negligently inflicted emotional distress upon him by (1) breaching the National Agreement, and (2) subjecting plaintiff to discrimination and harassment.  Id.  This Court finds that plaintiff's claim for negligent infliction of emotional distress for breaching the collective bargaining agreement is preempted under the LMRA, because this determination is founded directly on rights created by the agreement and will be substantially dependent on an

analysis of the agreement and whether its terms were breached.  As such, this Court recommends the Union's motion to dismiss relating to plaintiff's  claim for negligent infliction of emotional distress for the Union's breach of the collective bargaining be granted and that this claim dismissed with prejudice.

However, this Court does not agree with the Union's assertion that plaintiff's claim for negligent infliction of emotional distress claim based on the Union's discrimination and harassment is preempted under § 301 of the LMRA.  First, as it relates to the Union's alleged harassment of plaintiff, the Union owes a duty every member to society, not just to employees covered by the National Agreement, to not engage in this sort of conduct.

As to plaintiff's claim for negligent infliction of emotional distress claim based on discrimination due to plaintiff's ethnicity and disability, the statutory protection against discrimination provided by Title VII, the ADA, and the MHRA cannot be voided by the National Agreement.  See Lueck, 471 U.S. at 211-12 (finding that § 301 does not grant the parties to a collective bargaining agreement the ability to contract for what is illegal under state law); Alexander, 415 U.S. at 51 (holding that while certain rights under the NLRA are waivable, an individual's substantive right derived from an independent body of law cannot be avoided by a contractual agreement).   As such, this Court recommends that the Union's motion to dismiss on the grounds of  preemption due to alleged harassment and discrimination suffered by the Union be denied.

### 4.    Intentional Interference with Contractual Relations

Plaintiff alleges that the Union intentionally procured the breach of the contract (i.e. the National Agreement) between itself, plaintiff and the USPS, by withholding assistance normally due to its members.  See Pl.'s Mem. at p. 24.  "The Eighth Circuit

26

Court of Appeals recognizes that a claim for tortious interference with a contract 'requires examination of the collective bargaining agreement . . .'" Mohammed v. American West Holding Corp., 361 F.Supp.2d 982, 984-85 (D. Minn. 2005) (Railway Labor Act case) (quoting Johnson v. Anheuser Busch, Inc., 876 F.2d 620, 624 (8th Cir. 1989) (preemption under § 301 of the LMRA)).   To determine whether the Union wrongfully interfered with plaintiff's employment, a court would have to decide whether the Union properly provided assistance to plaintiff under the National Agreement. Plaintiff's tortious interference claim is "inextricably intertwined" with the National Agreement, and is preempted by the LMRA.  See Johnson, 876 F.2d at 624.

As such, this Court recommends that the Union's motion to dismiss, as it relates to plaintiff's claim for intentional interference with contractual relations, be granted and that the claim be dismissed with prejudice.

### B.   Preemption of State Claims under Garmon

Defendant also argued that "Garmon preemption", which derives from the case, San Diego Building Trades Council v. Garmon, 359 U.S. 236 (1959), requires that plaintiffs' state law claims be dismissed.  See Pl.'s Mem. at pp. 21-22.  In Garmon, the Supreme Court held that "[w]hen an activity is arguably subject to § 7 or § 8 of the [NLRA], the States as well as federal courts must defer to the exclusive competence of the [NLRA] Board if the danger of state interference with national policy is to be averted."  Id. at 245.  Garmon preemption "prevents States not only from setting forth standards of conduct inconsistent with the substantive requirements of the NLRA, but also from providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the Act."  Wisconsin Dept. of Industry, Labor and Human Relations v. Gould, 475 U.S. 282, 286 (1986) (citation omitted).  However, the party

claiming preemption under <u>Garmon</u> "bears the burden of establishing that the relevant conduct falls within the ambit of the NLRA." <u>Twin City Sprinkler Fitters v. Total Fire Protection, Inc.</u>, No. Civ. 02-930 PAMRLE, 2002 WL 31898170 at *3 (D. Minn. 2002) (citing <u>Int'l Longshoremen's Ass'n v. Davis</u>, 476 U.S. 380, 395 (1986) ("If the word 'arguably' is to mean anything, it must mean that the party claiming pre-emption is required to demonstrate that his case is one that the Board could legally decide in his favor.")).

The only argument the Union made in support of <u>Garmon</u> preemption was that "[p]laintiff's Complaint specifically alleges that the conduct described violates the National Labor Relations Act, 29 U.S.C.§ 158, <u>et seq</u>. (Third Claim for Relief)" <u>See</u> Pl.'s Mem. at p. 22. This assertion alone with no other support does not meet the Union's burden to demonstrate preemption under <u>Garmon</u> applies to plaintiff's state claims. Moreover, plaintiff stated in his opposition brief that he was dismissing his Third Claim for Relief. <u>See</u> Pl.'s Mem. at p. 16. As such, there is no basis for the Union to rely on this claim in support of its argument under <u>Garmon</u>. For all of these reasons, defendant's motion to dismiss as it pertains to <u>Garmon</u> preemption should be denied.

## C. Failure to State Claims of Defamation, Intentional Infliction of Emotional Distress, and Negligent Infliction of Emotional Distress

As this Court is recommending that plaintiff's claims of defamation and intentional infliction of emotional distress, along with some parts of his claim of negligent infliction of emotional distress, survive the Union's motion to dismiss based on preemption, the Court must now address the Union's alternative argument that these claims should be dismissed because they fail to state a claim for relief.

### 1.    Defamation

The Union argued that plaintiff has failed to state a claim for defamation because he failed to allege his defamation claim with the necessary particularity.  See Def.'s Mem. at p. 22.

A plaintiff making a claim for defamation under Minnesota law must plead and prove that (1) a false and defamatory statement was made; (2) the statement at issue was made to a third party; and (3) the statement tends to harm the plaintiff's reputation. See Schibursky v. International Business Machines Corp., 820 F. Supp. 1169, 1181 (D. Minn. 1993) (citation omitted); see also Dr. R.C. Samanta Roy Institute of Science and Technology, a Wisconsin non-stock corp. v. The Star Tribune Co., No. CIV 05-735 (PAM/RLE), 2005 WL 1661514 at *4 (D. Minn. July 15, 2005) (same).  In addition, under Minnesota law, a claim for defamation "'must be pled with a certain degree of particularity.'" French v. Eagle Nursing Home, Inc., 973 F. Supp. 870, 883 (D. Minn. 1997) (quoting Schibursky, 820 F. Supp. at 1181). "At a minimum, the plaintiff must 'allege who made the allegedly libelous statements, to whom they were made, and where.'"  Pope v. ESA Services, Inc., 406 F.3d 1001, 1011 (8th Cir. 2005) (quoting Schibursky, 820 F. Supp. at 1181); see also McClure v. American Family Mut. Ins. Co., 29 F. Supp.2d 1046, 1054 n. 7 (D. Minn. 1998) ("While it is not necessary for the Complaint to recite the exact language spoken, plaintiffs must identify who made the defamatory statement and what was said.") (citation omitted);  Thompson v. Campbell, 845 F. Supp. 665, 679-80  (D. Minn. 1994) (citing Stock v. Heiner, 696 F. Supp. 1253, 1260 (D. Minn. 1988) ("The fact that Thompson failed to recite the exact language spoken is not fatal to  her defamation claim. Although the complaint is not a model of

clarity, the court finds that it adequately identifies the false and defamatory statements as well as which defendants made the statements.").

Plaintiff's defamation claim provides in relevant part:

> The accusations published to third parties by Defendants of unlawful conduct by Plaintiff [Specifically: Johnston, et al accusing Plaintiff of trying to avoid work; acquiring medical restrictions as for other reasons than proper and lawful motive; Plaintiff perjured himself by lying to the investigators of the NLRB, EEO, and EEOC] were false, unprivileged, and defamatory, and Plaintiff did not at any time engage in the unlawful conduct alleged by defendant.

> * * *

> Because the false and defamatory statement published by Defendants impute to Plaintiff unlawful conduct and also injured Plaintiff in his employment, the statement of defendants constitutes libel per se. . . .

See Complaint, ¶¶ 181-182.

Plaintiff has alleged that the Union through its agent, Johnston, accused plaintiff of trying to avoid working and improperly acquiring medical restrictions.  While plaintiff alleges that Johnston made these statements, plaintiff never identifies a third party to whom they were communicated.  Rather, the allegations in the Complaint reference communications only between plaintiff and Johnston regarding his trying to avoid work. See Complaint, ¶¶ 68, 71.  The Court also notes that while the Complaint alleges that "carriers began avoiding Plaintiff.  The rumor was that he was trying to avoid work with fake doctor's notes."  Id., ¶ 89. There is no mention as to whom was responsible for spreading these rumors, the Union or USPS, much less to whom they were communicated.  Consequently, this Court finds that plaintiff has not adequately plead publication--pertaining to whom the statements were made as it relates to alleged

statements made by steward Johnston that plaintiff was attempting to avoid work or improperly obtain work restrictions.

Plaintiff also alleges Johnston defamed plaintiff by claiming that he had perjured himself by lying to the investigators of the NLRB, EEO, and EEOC. Apparently, plaintiff's contention is that because Johnston's testimony to federal investigators contradicted his own, Johnston was communicating to federal investigators that plaintiff was perjuring himself. Id., ¶¶ 135, 136, 144; see also Pl.'s Mem. at p. 16. In this regard, plaintiff alleged that Johnston lied to federal investigators that the issue with management on December 20, 2003 was not about management's failure to accept plaintiff's doctor note, but instead was about plaintiff's refusal to carry a route due to his medical restrictions. Id., ¶ 135. Plaintiff also alleged that Johnston lied to the NLRB investigator by claiming that he tried to get plaintiff to sign a grievance, but that plaintiff had refused. Id., ¶ 136. While the statements made by Johnston to investigators may be false, they are not on their face defamatory statements made regarding plaintiff.

Finally, plaintiff argues in his opposition memorandum that a claim of defamation against the Union exists because steward Berkovitz and other unidentified stewards were spreading rumors that plaintiff was going to come and kill employees of the USPS. See Pl.'s Mem. at p. 16. Even if this claim was made in the Complaint, which it was not[9], it would still not save plaintiff's defamation claim as it did not identify to whom the statements were made.

---

[9] Plaintiff's Thirteenth Claim for Relief, the defamation claim, made no mention of this statement, and therefore is not presently apart of this action. Further, while plaintiff did allege in his Complaint that "stewards continue to spread rumors that Plaintiff has been, and still is, making terroristic threats", he did not identify Berkovitz or any other person, nor did he allege to whom the statements were made. See Complaint, ¶ 146.

For all the above stated reasons, this Court finds that the Union's motion to dismiss as it relates to plaintiff's defamation claims should be granted and the claims denied without prejudice.

### 2.   Intentional Infliction of Emotional Distress

The Union argued that plaintiff has failed to state a claim for intentional infliction of emotional distress because he did not allege any facts supporting such a claim. See Def.'s Mem. at p. 24. "Under Minnesota law, the elements of intentional infliction of emotional distress are: (1) the defendant's conduct was extreme and outrageous; (2) the conduct was intentional or reckless; (3) it caused emotional distress; and (4) the distress was severe." Hill v. Scott, 349 F.3d 1068, 1075 (8th Cir. 2003) (citing Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 438-39 (Minn. 1983)). The conduct at issue "'must be extreme and outrageous, so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community.'" Id. (quoting Haagenson v. Nat'l Farmers Union Prop. & Cas. Co., 277 N.W.2d 648, 652-53 n. 3 (Minn. 1979)).

Plaintiff asserts that the Union intentionally inflicted emotional distress upon his person by discriminating against him, spreading false statements, perjuring itself, obstructing justice, and conspiring with the USPS to force him to take unpaid medical leave. See Complaint, ¶ 186. Defendant argues that these assertions are not factual allegations, but instead are legal conclusions. See Def.'s Mem. at p. 24. This Court disagrees. Reading the Complaint as whole, and in a light most favorable to plaintiff, it finds that a claim for intentional emotional distress has been adequately pled. Plaintiff has not merely relied on conclusory statements for this claim; he has alleged specific facts to support it. For example, plaintiff pled that Union stewards, amongst others, subjected him to hostile work environment due to his ethnicity and perceived religion.

Id., ¶¶ 20, 25, 95, 123, 143.  In addition, with respect to the false statements allegedly spread by the Union, plaintiff alleged that Union stewards accused him of making terroristic threats, that he was trying to avoid work, and that he had perjured himself to the investigators from the NLRB, and EEOC.  See Complaint, ¶¶ 144, 146, 181.  With regards to perjury and obstructing justice, plaintiff alleged that the Union and its agents lied to federal investigators as to the events that occurred on September 30, 2003 and December 20, 2003.  In particular, plaintiff alleged that steward Johnston lied to the NLRB about Supervisor Benda not accepting plaintiff's doctor's notes, but that the dispute was about plaintiff's refusal to carry an assigned route.  Id., ¶ 135.  In addition, plaintiff alleged that steward Johnston lied to the NLRB investigator by stating that he tried to get plaintiff to sign a grievance but that plaintiff refused.  Id., ¶ 136.  Further, plaintiff asserted in his Complaint that the Union, through its stewards, made a deal with USPS management that after the old USPS management was gone in December of 2003, the new management team would take care of the plaintiff.  Id., ¶ 82.  Finally, the Complaint asserted that the Union's conduct was extreme and outrageous and caused him to suffer severe mental anguish, distress, depression, and humiliation.  Id., ¶ 188.  As such, for purpose of this motion to dismiss, the Court finds that plaintiff has sufficiently pled his claim for intentional infliction of emotional distress.

### 3.    Negligent Infliction of Emotional Distress

As stated previously, plaintiff alleges that the Union negligently inflicted emotional distress upon his person by breaching the collective bargaining agreement, discriminating and harassing him, spreading false statements, perjuring itself, obstructing justice, and conspiring with the USPS to force him to take unpaid medical leave.  See Complaint, ¶ 192.

33

A claim for negligent infliction of emotional distress requires a plaintiff to show "that he was within a zone of danger of physical impact, reasonably fears for his safety, and consequently suffers severe emotional distress with resultant physical injury." Hasher v. City of Rochester, No. Civ. 04-2979 (PAM/RLE), 2005 WL 1925856 at *6 (D. Minn. Aug. 11, 2005) (citing Stadler v. Cross, 295 N.W.2d 552, 553 (Minn. 1980)); see also Fearing v. St. Paul Police Dept., No. 02-4744 (ADM/JSM), 2005 WL 914733 at *6 (D. Minn. 2005) (citation omitted) ("To establish such a claim, a plaintiff must demonstrate that she: (1) was within the zone of danger of physical impact; (2) reasonably feared for her own safety; and (3) suffered severe emotional distress with attendant physical manifestations."). Given that plaintiff has not alleged that he was in a zone of danger of physical impact that led to severe emotional distress and physical manifestations, the Union's Motion to Dismiss, as it relates to plaintiff's claim of negligent infliction of emotional distress, should be granted and the claim be dismissed without prejudice.

## V.  FAILURE TO STATE A CLAIM UNDER FEDERAL AND STATE DISCRIMINATION LAWS

### A.  Retaliation Against the Exercise of First Amendment Rights under 42 U.S.C. § 1983

Defendant argued that while plaintiff alleged that he was retaliated against for the exercise of his First Amendment rights, "there are no facts to support that he was engaged in a constitutional activity, nor is there an allegation of adverse action, or facts to support a casual connection." See Def.'s Mem. at p. 18. Plaintiff countered that his Complaint contained allegations that USPS management, with the collaboration of the

Union through steward Toner, stated that he was retaliated against for allegedly "bad mouthing" the United States.  See Pl.'s Mem. at p. 14.[10]

"'In order to establish a claim for unlawful First Amendment retaliation, a public employee must show that [he] suffered an adverse employment action that was causally connected to [his] participation in a protected activity.'"  Meyers v. Starke, 420 F.3d 738, 744 (8th Cir. 2005) (quoting Duffy v. McPhillips, 276 F.3d 988, 991 (8th Cir. 2002)).  However, plaintiff's retaliation claim, which is premised on 42 U.S.C. § 1983, fails because he has failed to state a claim for relief under § 1983.  Section 1983 protects individuals from unlawful conduct by the state, and does not apply to actions by a private individuals or private entities.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 150 (1970).  Labor unions, including the Union, are generally regarded as private entities that fall outside of § 1983's purview.  See Stodghill v. Service Employees Intern. Union, Local 50, AFL-CIO, CLC, 192 F.3d 1159, 1162  (8th Cir. 1999); see also Hudson v. Chicago Teachers Union Local No. 1, 743 F.2d 1187, 1191 (7th Cir.1984), aff'd, 475 U.S. 292 (1986); Socha v. National Ass'n of Letter Carriers Branch No. 57 (Merged), 883 F. Supp. 790, 797 (D.R.I. 1995).  However, there are occasions where a private party such as a union may be liable under § 1983 for conspiring with public officials "to violate a private citizen's right to freedom of speech under the First Amendment, just as it may be held liable for conspiring to violate other constitutional rights."  See Dossett v. First State Bank, 399 F.3d 940, 950 (8th Cir. 2005) (citing

---

[10]     The Court notes that there is no mention in the Complaint that the steward Toner attempted to restrict plaintiff's free speech; only that Toner did not challenge the statements by plaintiff's supervisor, Curran, that carriers had complained about him bad-mouthing America, and that while plaintiff had the First Amendment guarantee to free speech, if Curran ever heard of any complaint by any carrier about plaintiff, Curran would have to let plaintiff go.  See Complaint, ¶ 20.

Hudson, 743 F.2d at 1191 ("[W]hen a public employer assists a Union in coercing public employees to finance political activities, that is state action; and when a private entity such as a Union acts in concert with a public agency to deprive people of their federal constitutional rights, it is liable under section 1983 along with the agency.")). But here, the USPS is a federal agency and is not a state actor subject to § 1983.  See Federer v. Gephardt, 363 F.3d 754, 758 (8th Cir. 2004) (citation omitted) (finding that a federal actor cannot be held liable under 42 U.S.C. § 1983, as the statute is limited to the actions of state actors); see also Federal Exp. Corp. v. U.S. Postal Service, 151 F.3d 536 (6th Cir. 1998) (acknowledging that the USPS is a federal agency); Wright v. Runyon, 2 F.3d 214, 216 (7th Cir. 1993) (same).  Plaintiff's First Amendment claim fails because he has not alleged that the Union conspired with a state actor to retaliate against him for the exercise of his First Amendment rights.  Absent allegations of state-directed action, plaintiff cannot prevail on a section 1983 claim.[11]  Thus, the Court recommends that plaintiff's First Claim for Relief be dismissed with prejudice.

**B.    Title VII Violations under 42 U.S.C. § 2000e-2000e-17 and MHRA, Minn. Stat. § 363A.08**

Defendant asserted that plaintiff's claim for relief under Title VII fails because it has no affirmative duty under Title VII to investigate and take steps to remedy employer discrimination, and because it is not liable for the actions of its shop stewards.  See

---

[11]    Further, even if the USPS were determined to be a state actor, plaintiff's allegation that Union retaliated against him because the Union steward did not say anything to plaintiff's supervisor when the supervisor allegedly stated that plaintiff would be terminated for exercising his First Amendment Right to free speech, may not be enough for a finding of liability.  Cf., Martin v. Local 1513 and Dist. 118 of the Intern. Ass'n of Machinists, 859 F.2d 581, 584 (8th Cir. 1988) (finding in the Title VII context that that neither the Eighth Circuit nor the Supreme Court, has gone so far as holding that a Union can be liable by way of acquiescence).

Def.'s Mem. at pp. 15-16.  Defendant further argues that plaintiff's claim for national origin discrimination under the MHRA must also be dismissed for the same reasons as his claim under Title VII.  Id. at p. 16.  In opposition, plaintiff maintains that he is suing the Union itself for discriminating against him based on national origin.  According to plaintiff, shop stewards called him names based on his nationality, and the Union withheld assistance it normally affords its members, which forced him to take unpaid medical leave from which he cannot return.  See Pl.'s Mem. at p. 10.

Title VII provides, "[i]t shall be an unlawful employment practice for a labor organization-(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(c)(1).

Minn. Stat. § 363A.08, subd. 1 provides in relevant part:

> Labor organization. Except when based on a bona fide occupational qualification, it is an unfair employment practice for a labor organization, because of race, color, creed, religion, national origin, sex, marital status, status with regard to public assistance, disability, sexual orientation, or age:
>
> (a) to deny full and equal membership rights to a person seeking membership or to a member;
>
> (b) to expel a member from membership;
>
> (c) to discriminate against a person seeking membership or a member with respect to hiring, apprenticeship, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment; or
>
> (d) to fail to classify properly, or refer for employment or otherwise to discriminate against a person or member.

"It is undisputed that Congress intended Title VII to cover labor unions."  See Dowd v. United Steelworkers of America, Local No. 286, 253 F.3d 1093, 1099 (8th Cir.

2001) (citing 42 U.S.C. § 2000e(d)-(e)).   In addition, the elements of a discrimination claim under Title VII and the MHRA are the same.  See Saulsberry v. St. Mary's Univ. of Minn., 318 F.3d 862, 866 (8th Cir. 2003).

Defendant correctly asserts that unions do not have a duty "to take remedial action for discriminatory acts by their individual members."   Eliserio v. United Steelworkers of America Local 310, 398 F.3d 1071, 1077 (8th Cir. 2005) (emphasis added) (citation omitted).  However, the Eighth Circuit has also found that the actions of steward can be used against a union for the purposes of Title VII.  See generally, Dowd, 253 F.3d at 1103.  That is not to say that a Union is "'responsible for every act of a shop steward, simply by virtue of his position. If he acts only as an individual rather than within the authority the union has conferred, the union is absolved.'"  Badlam v. Reynolds Metals Co., 46 F. Supp.2d 187, 201-202 (N.D.N.Y. 1999) (quoting N.L.R.B. v. Local 815, International Bhd. of Teamsters, Chauffers, Warehousemen and Helpers of America, 290 F.2d 99, 104 (2d Cir. 1961)) (citations omitted); see also Airco Speer Carbon-Graphite v. Local 502, Intern. Union of Elec., Radio, 494 F. Supp. 872, 877 (D.C. Pa. 1980) ("Third Circuit has suggested that the Union steward is in a position of agency comparable to that of the employer's foreman. Certainly a Union is not responsible for every act of a steward, simply by virtue of his position, but where, as here, the conduct falls within the apparent or actual authority of the steward, defendant is liable to the company.") (citing N.L.R.B. v. Brewery & Beer Distributor Drivers, etc., 281 F.2d 319, 321-322 (3d Cir. 1960)).

In this case, plaintiff has asserted that the Union, through its actions of its stewards, engaged in discrimination as evidenced by their ethnic slurs and their refusal to assist him with grievances he had with USPS management.  In this regard, plaintiff

alleged that during a meeting with plaintiff's supervisor and steward Toner, the supervisor told plaintiff that "that foreigners are hated here . . . [e]specially after 9/11, and particularly by veterans." See Complaint, ¶ 20.  Steward Toner did not challenge the supervisor's statement and also stated that he was a veteran and that veterans hated foreigners.  Id.  Plaintiff also alleged that Union stewards discriminated against him based on national origin and perceived religion -- Judaism.  Id., ¶ 25.  In particular, plaintiff alleges that Union stewards, amongst others, subjected him to slurs including: "Fucking Finn," "Stupid foreigner," "is it true that in Finland everybody fucks reindeer?", "Fucking Finlander", "Crazy Finn", "Don't speak that fucking Finn," "Fucking skinny Finn," "Boy," "My thin Finn," "Fucking Jew," "Why don't you back to Finland!", "Big Fucking Jerk from Finland. "  Id.  Plaintiff also alleged that that on December 2, 2003, steward Rimer, in the presence of steward Johnston yelled "Fucking Finlander," and said something about punching plaintiff.  Id., ¶ 95.  Plaintiff also alleged that Rimer responded to plaintiff's complaint about being called a "fucking Finlander", with "what's the big deal?"  Id., ¶ 123.  In addition, plaintiff argued that the Union discriminated against plaintiff from the day he started based on his ethnicity, which interfered with his employment, and created a hostile work environment.  Id., ¶ 143.  Finally, plaintiff alleged that the Union intentionally refused to provide him assistance that it normally affords its members because of his ethnicity.  Id.

Based on the allegations in plaintiff's Complaint, viewed in a light most favorable to plaintiff, this Court finds that plaintiff has stated a claim for relief against the Union under Title VII and under the MHRA.  The issue of whether the stewards were acting in their individual or Union capacities is a factual question that cannot be determined in a motion to dismiss.  As such, the Union's motion to dismiss with regards to plaintiff's

claims against it under 42 U.S.C. § 2000e-2000e-17 and MHRA, Minn. Stat. § 363A.08 should be denied.

### B.      Failure to Prevent a Conspiracy under 42 U.S.C. § 1986 (Seventh Claim for Relief)

According to the Union, plaintiff fails to state a claim for relief under 42 U.S.C. § 1986 because (1) plaintiff has not plead a claim supporting a claim under 42 U.S.C. § 1985; (2) plaintiff failed to plead a claim of conspiracy with sufficient particularity; (3) plaintiff cannot a support a § 1985 claim based on a redress of violations of Title VII; and (4) plaintiff failed to plead the elements of a § 1986 claim.  See Def.'s Mem. at p. 19.   Plaintiff responded by asserting that the Union conspired with the USPS to eliminate his employment in September of 2003.  See Pl.'s Mem. at p. 14.  According to plaintiff, the actions undertaken by the Union and the USPS in furtherance of the conspiracy were in violation of the FLMA, the National Agreement, and the best interest of the plaintiff.  Id. at p. 15.

Section 1986 provides a cause of action against "[e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of . . . [T]itle [42], are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do so, if such wrongful act be committed."

Title 42 U.S.C. § 1985(3) provides in relevant part:

> If two or more persons in any State or Territory conspire . . .
> for the purpose of depriving, either directly or indirectly, any
> person or class of persons of the equal protection of the laws
> . . . [and] if one or more persons engaged therein do, or
> cause to be done, any act in furtherance of the object of
> such conspiracy, whereby another is injured in his person or
> property, or deprived of having and exercising any right or
> privilege of a citizen of the United States, the party so injured

> or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

"A § 1986 claim must be predicated upon a valid § 1985 claim." Gatlin ex rel. Estate of Gatlin v. Green, 362 F.3d 1089, 1095 (8th Cir. 2004); (citing Jensen v. Henderson, 315 F.3d 854, 863 (8th Cir. 2002)). To establish a claim under § 1985, plaintiff must demonstrate: (1) a conspiracy; (2) for the purpose of depriving another of equal protection of the law; (3) an act in furtherance of the conspiracy; and (4) an injury to a person or property, or deprivation of a legal right. See Federer v. Gephardt, 363 F.3d 754, 757-58 (8th Cir. 2004) (citation omitted); see also Larson by Larson v. Miller, 76 F.3d 1446, 1454 (8th Cir.1996) (en banc). Claims under § 1985(3) also require a plaintiff to demonstrate a racial or class-based animus. See Griffin v. Breckenridge, 403 U.S. 88, 102 (1971); see also City of Omaha Employees Betterment Ass'n v. City of Omaha, 883 F.2d 650, 652 (8th Cir. 1989) ("The 'purpose' element of the conspiracy requires that the plaintiff prove a class-based 'invidiously discriminatory animus.'"); Bartell v. Lohiser, 215 F.3d 550, 560 (6th Cir. 2000) (finding that § 1985(3) covers only those "conspiracies against: 1) classes who receive heightened protection under the Equal Protection Clause; and 2) 'those individuals who join together as a class for the purpose of asserting certain fundamental rights.'") (quoting Browder v. Tipton, 630 F.2d 1149, 1150 (6th Cir. 1980)). Further, a plaintiff must allege an independent federal right has been infringed, as § 1985 is a statute that provides a remedy, but grants no substantive stand-alone rights. See Federer, 363 F.3d at 758.

Rule 8(a) of the Federal Rules of Civil Procedure provides in relevant part that a plaintiff need only include "a short and plain statement of the claim showing that the pleader is entitled to relief, . . ." However, the Eighth Circuit has found that a claim for

conspiracy must be alleged with more particularity than is normally required by Rule 8(b) of the Federal Rules of Civil Procedure.  "A plaintiff must allege with 'sufficient particularity' . . . that the parties reached some agreement and conspired together to deprive plaintiff of a federal right."   Gometz v. Culwell, 850 F.2d 461, 464 (8th Cir. 1988) (citation omitted); see also Marti v. City of Maplewood, Missouri, 57 F.3d 680, 685 (8th Cir. 1995) ("'[T]he [appellants] must allege with particularity and specifically demonstrate with material facts that the Unions reached an agreement.' This showing can be accomplished by pointing to facts suggesting that the appellees reached an understanding to violate appellants' civil rights.") (quoting Employees Betterment Ass'n v. Omaha, 883 F.2d 650, 652 (8th Cir. 1989)).  In addition, a plaintiff must allege, in conjunction with the conspiracy, that the union acted with class-based discriminatory animus.  See Cwick v. Life Time Fitness, Inc., No. Civ.04-2731 (PAM/RLE), 2004 WL 2065063 at *4 (D. Minn. Sept. 2, 2004) ("Because Plaintiffs allege that Defendants engaged in a private conspiracy, Plaintiffs must allege that Defendants acted with class-based discriminatory animus. . . .").

Plaintiff did not set forth any allegations comprising a § 1985 or § 1986 claim in his Seventh Claim for Relief Complaint.  Instead, he cited to § 1986 and asserted that the preceding 32 pages of facts included multiple and separate violations of § 1986. See Complaint, ¶¶ 165-167.  Having examined these facts, the Court concludes that he failed to state a claim for relief under § 1985, and thus, his claim under § 1986 also fails.

First, while plaintiff alleged that the Union stewards conspired with USPS management to have a meeting with plaintiff in order to force him into a less desirable light duty position, in violation of the Family Medical Leave Act and the National

Agreement (Complaint, ¶¶ 111-121), the civil rights statutes cannot be used as a vehicle to sue for a violation of the FMLA or a contract. See e.g., Desrochers v. Hilton Hotels Corp., 28 F. Supp.2d 693, 695 (D. Mass. 1998) (barring a claim under 42 U.S.C. 1983 based on a violation of the FMLA due to its comprehensive detailed enforcement provisions); O'Hara v. Mt. Vernon Bd. of Educ., 16 F. Supp.2d 868, 895 (S.D. Ohio 1998) (§ 1983 action premised on FMLA violation foreclosed); see generally, West v. Atkins, 487 U.S. 42, 48 (1988) ("To state a claim under section 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States. . . .").

Second, although plaintiff generally averred in his Complaint that the Union discriminated against him on the basis of his national origin and disability (Complaint, ¶ 142), disability-based discrimination is not actionable under § 1985(3). See Bartell v. Lohiser, 215 F.3d 550, 559 (6th Cir. 2000).

Third, as to his claim of a conspiracy based on his national origin, plaintiff never alleged in his Complaint that the conspiracy on the part of the Union was based on a class-based animus. As such, this Court finds that plaintiff has failed to state a claim for relief under § 1985. See Rachuy v. Murphy Motor Freight Lines, Inc., 663 F.2d 57, 58 (8th Cir. 1981) (per curiam) ("The complaint alleged no racial or class-based animus; therefore, dismissal of any purported claim under § 1985 was proper") (citation omitted); Schneeweis v. Northwest Technical College, No. Civ. 97-1742 (JRT/RLE), 1998 WL 420564 at *12 (D. Minn. June 01, 1998) (in dismissing a § 1985 on a motion for dismiss the court found that a plaintiff "must allege a discriminatory purpose 'in that the defendants selected the particular course of action 'because of not merely in spite of its adverse effects upon an identifiable group.'" (quoting Andrews v. Fowler, 98 F.3d

1069, 1079-80 (8th Cir. 1996), quoting Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 272 (1993)).  Failing to assert facts to support a § 1985, let alone such a claim in his Complaint, this Court recommends that plaintiff's § 1986 claim be dismissed without prejudice.

### C.    ADA Claim under 42 U.S.C. § 12101, et seq.

Defendant argues that plaintiff's ADA claim fails because he has "failed to allege facts that would support a claim under the ADA. . . ."  See Def.'s Mem. at p. 17. Specifically, the Union maintains that plaintiff (1) failed to state facts in his Complaint to suggest that his impairment substantially limits his ability, compared to the average person, to perform a major life activity; (2) failed to allege that he could perform the essential functions of the job with or without accommodation; and (3) failed to alleged that there was any causal connection between any alleged disability and any alleged adverse result.  Id. at p. 18.  On the other hand, plaintiff asserts that he has a qualifying disability under the ADA in the form of severe anxiety, depression, and accompanying physical problems.  See Pl.'s Mem. at p. 13.  In addition, plaintiff claims that the Union and the USPS refused to accept the reasonable accommodation of 40 hours per work week; the USPS picked a fight with plaintiff on September 30, 2003, with the collaboration of the Union; and that the Union and the USPS made a deal to get rid of plaintiff as a result of his disability.  Id.

The ADA, provides in relevant part:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).   Labor organizations are included in the definition of covered entities within the ADA.   See 42 U.S.C. § 12111(2).

"In the absence of evidence of direct discrimination, ADA claims are evaluated by the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)."  Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040, 1044 (8th Cir. 2005).   Under the McDonnell Douglas framework, "an employee must first establish a prima facie case of discrimination: (1) an ADA-qualifying disability; (2) qualifications to perform the essential functions of his position with or without a reasonable accommodation; and (3) an adverse action due to his disability."  Bass v. SBC Communications, Inc., 418 F.3d 870, 873 (8th Cir. 2005) (citing Kincaid v. City of Omaha, 378 F.3d 799, 804 (8th Cir. 2004)); see also Simpson v. Des Moines Water Works, 425 F.3d 538, 542 (8th Cir. 2005) (same) (quoting Henderson v. Ford Motor Co., 403 F.3d 1026, 1034 (8th Cir. 2005)).

The Union is asking this Court to find that plaintiff must allege a prima facie claim of disability discrimination in his Complaint, in order to proceed to discovery or trial. Such an argument ignores the basic precept that McDonnell Douglas is concerned with the basic allocation of burdens and order of presentation of proof in a discrimination case, and that a prima facie case under McDonnell Douglas is an evidentiary standard, not a pleading requirement.   See Swierkiewcz v. Sorema N.A., 534 U.S. 506, 510, (2002); see also Ring v. First Interstate Mortgage, Inc., 984 F.2d 924, 926-27 (8th Cir. 1998) (finding that "[U]nder the Federal Rules of Civil Procedure, an evidentiary standard is not a proper measure of whether a complaint fails to state a claim."); E.E.O.C. v Northwest Airlines, Inc., 216 F. Supp.2d 935, 939 (D. Minn. 2002) (citing Swierkiewcz, 534 U.S. 506, 122 S. Ct. 992, 997-98).   In addition, imposing a

requirement for pleading a discrimination claim with such specificity conflicts with and is contrary to the Federal Rules of Civil Procedure 8(a)(2), "which provides that a complaint must include only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"   Swierkiewcz, 534 U.S 512, 122 S. Ct. at 998.   "Such a statement must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'"   Id. (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).

In this case, plaintiff alleged his physician placed him on a restricted 40-hour per week schedule on September 10, 2003, due to excessive stress, anxiety, and accompanying physical problems.   See Complaint, ¶ 67.   This physician-mandated accommodation was presented to management in the presence of a Union steward. Id., ¶ 70.  Further, plaintiff asserted that the Union steward who dealt with the accommodation told plaintiff that he believed that he was trying to avoid work.   Id., ¶¶ 68, 71.   Plaintiff also asserted that the Union increased harassment and intimidation after he presented his request for an accommodation.   Id., ¶ 72.   Moreover, plaintiff claimed that the Union discriminated against him based on his disability, which interfered with plaintiff's employment, deprived him of benefits of afforded to other Union members, and created a hostile working environment.   Id., ¶¶ 142, 144.   Finally, plaintiff alleged that Union's discrimination against him on the basis of his disability caused him mental and physical ailments forcing him to take unpaid leave from which he is unable to return.   Id., ¶ 122.

In summary, plaintiff has alleged that he is disabled, that his doctor limited his ability to work to 40 hours per week because of his disability, and that the Union's discrimination based on his disability impeded his employment and forced him to take

unpaid medical leave.   All of these facts provide the Union with more than sufficient notice under Rule 8 as to the scope of plaintiff's ADA claim, and precludes dismissal under Rule 12(b)(6).   See Northern States Power Co. v. Fed. Transit Admin., 358 F.3d 1050, 1056-57 (8th Cir. 2004) (citing Rule 8(a) and stating that "[t]he essential function of notice pleading is to give the opposing party fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved.") (citation and internal quotations omitted)).   As such, the Union's motion to dismiss as it relates to plaintiff's ADA claim should be denied.

### D.     Criminal Aiding and Abetting Under Minn. Stat. § 363A.14

Plaintiff contends with regards to his aiding and abetting claim under the MHRA that the evidence will show that "there existed a conspiracy to aid and abet the USPS by the Union to obstruct and defeat the Plaintiff's seeking of remedies through the Postal EEO, EEOC and NLRB investigations."[12]   See Pl.'s Mem. at p. 12.

Minn. Stat. § 363A.14 provides that "it is an unfair discriminatory practice for any person: (1) Intentionally to aid, abet, incite, compel, or coerce a person to engage in any of the practices forbidden by this chapter."

There are no allegations contained in the Complaint, which assert that the Union conspired with the USPS to obstruct the ability of plaintiff to seek redress from the Postal EEO, the EEOC, or the NLRB.   Plaintiff did allege that the Union and USPS management had a meeting regarding plaintiff's legal actions.   See Complaint, ¶ 133. However, there are no allegations that the purpose of the meeting was to conspire

---

[12]     Plaintiff suggests that this claim will be further supported by the consolidation of this case with Peltonen v. United States, Civil File No. 05-162.   However, judgment in that case was entered against plaintiff on April 12, 2005.   See Civil File No. 05-162, Docket No. 19.

against plaintiff's ability to seek redress from with the Postal EEO, EEOC, and NLRB. Further, to the extent that plaintiff asserted facts relating to the interference with the Postal EEO, EEOC, and NLRB investigations, these facts dealt with actions by committed by the Union, and made no mention of the USPS. Id., ¶¶ 135, 136, 144.

Given that plaintiff has failed to allege any facts to support his argument that the Union aided or abetted the USPS by obstructing and defeating his ability to seek remedies through the Postal EEO, EEOC and NLRB investigations, this claim should be dismissed. As such, this Court recommends that plaintiff's claim under Minn. Stat. § 363A.14 be dismissed without prejudice for failure to state a claim for relief.

**E.    Intentional Reprisal under the Minnesota Human Rights Act, Minn. Stat. § 363A.15**

The Union maintains that plaintiff has failed to state a colorable reprisal claim under the MHRA. Specifically, the Union asserts that plaintiff has not stated that he engaged in a statutorily protected activity, that the Union took an adverse action against plaintiff, and a causal connection between the two. See Def.'s Mem. at p. 17. Plaintiff counters that in response to his complaints to management and the Union about the treatment to which he was subjected by USPS employees, the Union made a deal with the USPS to get rid of him and that the Union's failed to provide him with assistance. See Pl.'s Mem. at pp. 12-13. Further, plaintiff claims that steward Rimer threatened him with physical violence, and this is further proof of reprisal. Id. at p. 13. Plaintiff also alleges that steward Rimer commented to several employees that plaintiff would never work at the Post Office again after plaintiff complained about the slur "fucking Finlander." According to plaintiff, this is the type of harassment that is prohibited by the MHRA reprisal statute. Id. at p. 13.

Minn. Stat. § 363A.15 provides in relevant part:

It is an unfair discriminatory practice for any individual who participated in the alleged discrimination as a perpetrator, employer, labor organization, . . . or employee or agent thereof to intentionally engage in any reprisal against any person because that person:

(1) Opposed a practice forbidden under this chapter or has iled a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter;

* * *

A reprisal includes, but is not limited to, any form of intimidation, retaliation, or harassment.

The elements to a reprisal daim under the MHRA include that (1) the plaintiff engaged in a protected activity; (2) suffered an adverse employment action; and (3) that there is a causal connection between the two. See Olson v. International Business Machines, No. Civ. 05-118 MJD/AJB, 2006 WL 503291 at *13 (D. Minn. March 1, 2006) (citing Heisler v. Metro. Council, 339 F.3d 622, 632 n. 6 (8th Cir. 2003)).  The MHRA prohibition on reprisal is broader than that of Title VII in that it defines reprisal to include "'any form of intimidation, retaliation, or harassment.'"  See Thorn, 305 F.3d at 830-31 (quoting Minn. Stat. § 363A.15, subd. 7).

Plaintiff's claims of retaliation for engaging in protected activity in his Complaint include the following:

- In the end of August of 2003, plaintiff filled out a survey and wrote a personal letter to the Postmaster of Minneapolis, in which he complained about constant harassment by management.  Id., ¶ 62.  Plaintiff alleged that management and the Union then retaliated against him for his input to the Postmaster by increasing their intimidation and harassment of him, which affected his body and mind.  See Complaint, ¶¶ 63, 64.

- On September 10, 2003, plaintiff's physician placed him on a restricted 40-hour per week schedule due to excessive stress and anxiety

accompanied by physical problems.  Id., ¶ 67.  Plaintiff showed the doctor's note to steward Johnston who replied that management would "not like this at all," that plaintiff had gotten the doctor's note to avoid work and because he was tired of dealing with Carleen.  Id., ¶ 68.  Johnston's attitude towards plaintiff then changed and he became openly critical of plaintiff's problems with management.  Id., ¶ 69.

- Plaintiff wrote a complaint about the December 20, 2003 incident to the Union.  Id., ¶ 106.  He also met with his psychiatrist who prescribed a two-week leave.  Id., ¶ 107.  Plaintiff went to the station to give the doctor's note to manager Provo, when stewards Rimer and Johnston approached plaintiff and suggested that he have a meeting with Provo to resolve all issues.  Id., ¶¶ 108-110.  According to plaintiff, Johnston conspired with Provo and Rimer to have a meeting with plaintiff in order to force him into a light duty position, which is prohibited by the National Agreement, interfered with his rights under the FMLA, and amounted to an adverse employment action.  Id., ¶¶ 111-121.  According to plaintiff, the continuous harassment and discrimination was so severe that in response to the final "betrayal" by the Union and USPS, a psychiatrist ordered to make him take medical leave on December 23, 2003.  Id., ¶ 122.  Plaintiff asserted that this forced, unpaid medical leave is an adverse employment action and constitutes constructive discharge.  Id.

- Union steward Rimer stated to other employees that plaintiff would never work for the post office after complained about the slur "fucking Finlander." See Complaint, ¶ 123.

- After making inquiries regarding his EEO complaint against the USPS, the Union president claimed plaintiff was not member of the Union.  Id., ¶¶ 125, 127.

- In retaliation for reporting steward Rimer's ethnic slur, the Union refused to assist plaintiff and conspired to have him arrested.  Id., ¶ 124.

This Court finds that these allegations constitute a colorable reprisal claim under the MHRA for the purpose of surviving defendant's 12(b)(6) motion to dismiss.  Plaintiff has alleged numerous occasions were he has engaged in protected activity, mainly complaining about workplace harassment and reporting his inability to work due to medical conditions, and that he was intimidated, retaliated against, harassed by the Union, and ultimately forced to leave his job because he had engaged in this protected conduct.

As such, this Court recommends that the Union's motion to dismiss be denied with regards to plaintiff's claim for reprisal under the MHRA.

## **RECOMMENDATION**

For the reasons set forth above and based on all the files, records, and proceedings herein, IT IS RECOMMENDED that: Defendant Branch No. 9, National Association of Letter Carriers' Motion to Dismiss Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) [Docket No. 8] be **GRANTED** in part and **DENIED** in part as follows:

1.     Defendant's Motion to Dismiss be  **GRANTED**  with regards to plaintiff's claims for:

   a.     Retaliation against the exercise of First Amendment rights under 42 U.S.C. § 1983 (First Claim for Relief);

   b.     Violation of the NLRA under 29 U.S.C. §§ 158 et seq. (Third Claim for Relief);

   c.     Civil rights violations under 18 U.S.C. § 241 (Fifth Claim for Relief);

   d.     Civil rights violations under 18 U.S.C. § 245 (Sixth Claim for Relief);

   e.     Civil rights violations under 18 U.S.C. § 1986 (Seventh Claim for Relief);

   f.     Civil rights violations under the Minnesota Human Rights Act 363A.02 (Ninth Claim for Relief);

   g.     Criminal aiding and abetting under Minn. Stat. § 363A.14 (Tenth Claim for Relief);

   h.     Defamation (Thirteenth Claim for Relief);

   i.     Negligent infliction of emotional distress (Fifteenth Claim for Relief); and

   j.     Intentional interference with contractual relations (Sixteenth Claim for Relief).

All these claims, except for plaintiff's civil rights violations under 18 U.S.C. § 1986, criminal aiding and abetting under Minn. Stat. § 363A.14, defamation, and negligent infliction of emotional distress claims, should be dismissed **WITH PREJUDICE**.  Plaintiff's civil rights violations under 18 U.S.C. § 1986, criminal aiding and abetting under Minn. Stat. § 363A.14, defamation, and negligent infliction of emotional distress claims should be dismissed **WITHOUT PREJUDICE**.

    2.    Defendant's Motion to Dismiss be **DENIED** with regards to plaintiff's claims for:

        a.    Title VII Violations under 42 U.S.C. with regards to plaintiff's claims for 2000e-2000e-17(Second Claim for Relief);

        b.    Civil right violations under the Minnesota Human Rights Act 363A.08 (Fourth Claim for Relief);

        c.    ADA violations under 42 U.S.C. § 12101 et seq. (Eighth Claim for Relief);

        d.    Intentional reprisal under Minn. Stat. 363A.15 (Eleventh Claim for Relief); and

        e.    Intentional infliction of emotional distress (Fourteenth Claim for Relief).

Dated:      July 5, 2006

                    s/ *Janie S. Mayeron*
                    JANIE S. MAYERON
                    United States Magistrate Judge

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **July 21, 2006**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.   A party may respond to the objecting party's brief within ten days after service thereof.   All briefs filed under this Rules shall be limited to 3500 words.   A judge shall make a de novo determination of those portions to which objection is made.   This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendations, the party making the objections shall timely order and file a complete transcript of the hearing on or before **July 21, 2006**.